THE DAKOTA STOCK AND GRAZING COMPANY, LIMITED, PLAINTIFF IN ERROR, V. EDWARD R. PRICE, FRANK PRICE, LEWIS G. JENKS, AND CHARLES. W. SEABURG, AS PRICE & JENKS, DEFENDANTS IN ERROR.

**Contract:** RESCISSION: PAYMENT: TENDER. D. company purchased of P. & J a herd of cattle and calves, ranch, the possessory right of herding range, and miscellaneous oufit of herding and ranching property, situated at and known as "The Chadron Creek Ranche," on Chadron Creek, in Sioux county, Nebraska. The purchase price was $76,530, $50,000 of which was paid down, the remaining sum, $26,530, was to be paid on or before the 26th day of June, next ensuing the date of purchase, April 7th, 1883; also a sum equal to the running expenses of the herd from December 26th, 1883, to the day of payment. There was a bill of sale, expressing the terms of sale as above, signed by P. & J., and placed in escrow in a bank at Cheyenne, Wyoming Territory, with the following memoranda: "Placed in escrow with Morton E. Post & Co., this 10th day of April, 1884, to be delivered to said Dakota Stock & Grazing Company, Limited, upon compliance by said company with the terms of within instrument, such compliance to be evidenced by the acknowledgment in writing thereof by Price & Jenks, otherwise to be returned to Price & Jenks." About the 4th day of June, the agent of D. Co. informed P. & J. personally, at the city of Chicago, that he was on his way to Cheyenne, and the Chadron Creek ranch, for the purpose of closing up said business. On the 6th he wrote them from Council Bluffs, Iowa, requesting them to come or send an order to Chadron Creek, whereby, on their part, the business might be settled up; and again on the 10th, he telegraphed them from Cheyenne to the same purpose. On the 11th P. & J. replied by telegraph from Chicago: "Impossible to make delivery or settlement now. Will be in Cheyenne prepared June 26th."

In an action by D. Co. to rescind said contract and recover back the money paid thereon, *Held*,

1. That D. Co. was not in default by reason of its not paying or tendering the $26,530 due on the contract of purchase, and a sum equal to the expense of keeping the herd, as provided in the contract, at the bank of Morton E. Post & Co., at Cheyenne, P. & J. declining to give any assurance that the property at Chadron Creek ranch would be delivered, or the dominion thereof turned over to it on that day.

2. That P. & J. were in default in failing and refusing to take the necessary steps to enable them to deliver the possession, control, and dominion of the property to D. Co. on the 26th day of June, or sooner, in case D. Co. chose to make payment and "take over" the property before that date, and in failing to deliver.the property sold on the date last above mentioned.

3. That upon the facts and law above stated, D. Co. may rescind the contract of purchase, and recover back the money paid thereon.

ERROR to the district court for Lincoln county. Tried below before HAMER, J.

J. C. Cowin, for plaintiff in error.

John L. Webster and J. M. Woolworth, for defendants in error.

COBB, J.

This action was, in effect, an action to rescind a contract made by the plaintiff company with the defendants for the purchase by it, from them, of a quantity of personal property, and to recover back from them a sum of money paid thereon. The contract was evidenced by a paper writing executed by the defendants to the plaintiff, in the form of a deed, which I here copy from the bill of exceptions:

"Know all men by these presents: That we, Price & Jenks, a firm composed of Edward R. Price, Frank Price, and Lewis G. Jenks, existing and doing business in the county of Laramie, Wyoming, and Charles W. Seabury, of Boston, Massachusetts, by Price & Jenks, aforesaid, his agents and attorneys in fact, and Theodore W. Sterling, of New York City, by Price & Jenks, his agents and attorneys' in fact, parties of the first part, and the Dakota Stock and Grazing Company (limited), a corporation created and existing under and by virtue of the laws of the kingdom of

7

Great Britain, and doing business in the territory of Wyoming, party of the second part, witnesseth:

"That for and in consideration of the sum of ten thousand (10,000) dollars, lawful money of the United States of America, to the said parties of the first part in hand paid, at or before the ensealing and delivery hereof, receipt whereof is hereby acknowledged, and the further sum of forty thousand (40,000) dollars, lawful money of the United States of America, to be paid by the party of the second part to the parties of the first part on or before the tenth (10th) day of April, 1884, and the further sum of twenty-six thousand five hundred and thirty (26,530) dollars, lawful money of the United States of America, and also a sum in like money equal to all the running expenses of the herd of neat cattle and property hereinafter described and hereby conveyed, paid, laid out, or incurred by said first parties—from and including the twenty-sixth (26th) day of December, 1883, up to and including the day of such payment, to be paid by the party of the second part to the parties of the first part, on or before the twenty-sixth (26th) day of June, 1884—

"The said parties of the first part have sold and conveyed, and by these presents do hereby sell, assign, transfer, convey, and set over unto the said party of the second part, and to its successors and assigns, all the following described neat cattle, horses, mules, ranches, buildings, fences, improvements, brands, grazing rights and privileges, goods and chattels, situate, lying, and being on Chadron creek, Sioux county, Nebraska, and more particularly described as follows, to-wit:

"All the herd of neat cattle and all the neat cattle composing the herd of the said parties of the first part, consisting of seventeen hundred and thirty-three (1,733) head of grown neat cattle, and six hundred and eight (608) calves, the increase of the said neat cattle, as the said neat cattle were tallied, and the said calves were branded and tallied

during the year 1883 by the said parties of the first part as the same are now running or ranging, be they more or less, at the date of the execution hereof, on the range of the said parties on and in the county adjacent to Chadron creek, Sioux county, Nebraska, or wheresoever the same or any part thereof, may be running, ranging, or be found; the said neat cattle all being branded and marked with one or more of the following brands, to-wit:—"E," "E," "ET," and also all the increase of the said neat cattle, branded, unbranded, or hereafter to be branded.

"And also the brands aforesaid, as the same are now recorded in the county of Laramie, Wyoming, and in the county of Cheyenne, Nebraska, and all the right, title, and interest of the said first parties, or either of them, of, in, and to the said brands, and all the privileges and rights of the said first parties, or either of them, to the said brands appertaining, with full power and authority to the said party of the second part, and its successors and assigns, to have the said brands, or either of them, transferred to itself or others, according to law, where the same are now recorded in the names of said first parties.

"And also all the saddle horses of the said first parties belonging to and used in connection with the aforesaid herd of neat cattle, and now in, upon, and about the range and ranch of said first parties on Chadron creek aforesaid, and being in number sixty-seven (67) head, more or less, and all branded with the aforesaid "E" brand on the left hip.

"And also all the mules of the said first parties branded with the aforesaid "E" brand on the left hip, consisting of four (4) head, more or less, as the same are now running and ranging upon the ranch and range aforesaid of said first parties, and as the same are now being used in connection with the said herd of neat cattle. And also one log ranch house, one log stable, one log tool house and wagon shed, one log hen house, four (4) corrals, one wire

fence enclosing hay meadow, one wire fence enclosing garden, together with all other improvements, whether herein enumerated or not, of said first parties, situate on Chadron creek, Sioux county, Nebraska, aforesaid.

"And also all the possessory rights of said first parties, of, in, and to the ranch and range upon which the said neat cattle have been heretofore ranging and running, as the same have been, and are at the date of these presents, enjoyed, occupied, possessed, and held by the said first parties.

"And also all the branding irons of the brands aforesaid, three (3) wagons, one (1) mowing machine, one (1) rake, two (2) sets of harness, one lot of lumber, and all the camp, ranch and round-up outfits, and all tools, implements, machinery, utensils, furniture, provisions, and supplies, and all other articles of personal property belonging to said first parties, now in, upon, or about the said ranch, whether herein enumerated or not, to the said herd of cattle appertaining or belonging.    To have and to hold the same, and each and every part and parcel thereof, to the said party of the second part, and to its successors and assigns forever.

"And the said parties of the first part for themselves, their executors, administrators, and assigns, hereby covenant and agree to and with the said party of the second part and its successors and assigns, that the number of neat cattle, as hereinbefore given, were actually by them tallied and counted; and that the number of calves stated as having been by them branded and tallied, were actually branded and tallied by them during the year 1883, and that they, the said parties of the first part, have not since the aforesaid tally and count of the neat cattle hereby sold and conveyed, sold or in any manner of disposed the same, nor of any part thereof; and that they have good right and lawful authority, in manner and form aforesaid, to sell and convey the aforesaid neat cattle, property, rights, and privileges; that the same, and each and every part and parcel

thereof, are now free and clear of and from any and all encumbrances and liens of what kind and nature soever; and that the same and each and every part and parcel thereof, except the possessory rights aforesaid, in the quiet and peaceable possession of said second party and its successors and assigns, against the lawful claims of any and all persons whomsoever they shall and will warrant, and by these presents forever defend.

"In witness whereof, the said parties of the first part have hereunto set their hands and seals, this seventh day of April, in the year of our Lord one thousand eight hundred and eighty-four.

"Signed, sealed, and delivered in presence of Samuel Rosendale.

"(Signed)     PRICE & JENKS,          [Seal.]
"(Signed)     EDWARD R. PRICE,        [Seal.]
                 By PRICE & JENKS,
                     His Attorneys in fact.
"(Signed)     FRANK PRICE,            [Seal.]
"(Signed)     LOUIS G. JENKS,         [Seal.]
"(Signed)     CHARLES W. SEABURY,     [Seal.]
                 By PRICE & JENKS,
                     His Attorneys in fact.
"(Signed)     THEODORE W. STERLING, [Seal.]
                 By PRICE & JENKS,
                     His Attorneys in fact."

At the foot of said instrument appears the following receipt:

"CHEYENNE, April 10, 1884.

"Received from the Dakota Stock and Grazing Company, Limited, forty thousand ($40,000) dollars, by hand of M. E. Post & Co., being the second payment on the within bill of sale.

"(Signed)                    PRICE & JENKS."

And accompanying it, the following memoranda:

"BILL OF SALE FROM PRICE & JENKS TO DAKOTA
STOCK AND GRAZING COMPANY, LIMITED.

"Placed in escrow with Morton E. Post & Co., this
10th day of April, 1884, to be delivered to said Dakota
Stock and Grazing Company, Limited, upon compliance
by said company with the terms of within instrument,
such compliance to be evidenced by the acknowledgment
in writing thereof, by Price & Jenks, otherwise to be re-
turned to Price & Jenks."

Although the delivery of the above instrument is duly
witnessed, it seems to be conceded that it never was in fact
delivered to the plaintiff but placed in the banking house
of Morton E. Post & Co., at Cheyenne.  The ranch and
range on Chadron creek, Sioux county, Nebraska, where
said cattle and other personal property were situated, are
distant about two hundred miles from Cheyenne, which at
that time was, as appears from the abstract, the nearest
railroad or telegraph point thereto.  There was no means
of communication or travel between those two points,
except private horseback or wagon, and the time necessary
to travel from one point to the other was "four or five days
in round numbers."  In all the transactions of the case
the plaintiff was represented by one Richard Frewen, its
manager and agent.  At the date of the deed, or contract
for the sale of the property, the cattle, calves, ranch, and
other property therein described, at Chadron creek ranch,
were in the care, custody, and control of Robert Harrison,
foreman of the defendants, and the cattle were being
herded and cared for by him, with the assistance of some
eight or ten hired men or cow boys, all in the service of the
defendants.  From the date of the contract of sale until the
23d day of June, 1884, Frank Price and Lewis G. Jenks,
the active members of the firm of Price & Jenks, defend-
ants, were both in Chicago, Illinois.  On or about the
first day of June, 1884, they, or one of them, wrote to

Robert Harrison, their foreman at the ranch, not to turn any of the property over to Mr. Frewen, nor to anybody else, until he had an order from them. About the middle of June, Frewen deposited $33,000 in the hands of Morton E. Post & Co., at Cheyenne, and instructed G. W. Collins, their cashier, to pay to Price & Jenks the balance or final payment of $26,530, together with the expense account for keeping the herd, on the 26th day of June, if they could show Mr. Collins, or would assure him, that the property would be delivered or turned over to him on that day. He then proceeded to the ranch on Chadron creek, arrived there on the 23d day of June, and informed Mr. Harrison, foreman in charge, that he would be there on the 26th day of June for the purpose of receiving, and prepared to receive, the possession of the herd, ranch, and other property embraced in the sale, and asked him whether he had received instructions from Price & Jenks to deliver the property. On the 26th day of June, Frewen again went to the Chadron creek ranch with his foreman, prepared to receive the possession of the property, and demanded the same from Mr. Harrison, the foreman of Price & Jenks, which was refused.

On the same day, the 26th day of June, Frank Price and Lewis G. Jenks went to the banking house of Morton E. Post & Co., at Cheyenne, and of G. W. Collins, cashier in charge, demanded payment of the sum of $26,530· remaining unpaid on the cattle deal, also the expense account. Mr. Collins expressed his readiness and willingness to pay these sums on being satisfied, or assured, that the property would be delivered on that day; but declined to pay without such assurance. They declined to give such assurance, but offered to give him an order on their foreman for the property.

At the trial to a jury, upon proof of facts of which the foregoing is the substance, the district court directed a finding for the defendants, overruled the plaintiff's motion for a new trial, and rendered a judgment for the defendants.

The plaintiff brings the cause to this court on error. There are several errors assigned; but as the case turns on the 6th, "that the verdict is contrary to law," and as counsel have not discussed them in detail, they will not be set out or specified here; and our discussion will be confined to the consideration of the correctness of the court's direction to the jury.

Counsel on neither side, either in their briefs or at the bar, attach much, if any, importance to the fact that the contract was delivered only as an escrow, but rather treat the terms of the contract as defining the rights of the parties, as well as their respective duties toward each other, the same as though it had been delivered to the plaintiff, or had existed only in parol. Iu this respect I will follow them in considering the law of the case.

As we have seen, the purchase price of the property, as agreed upon, was seventy-six thousand five hundred and thirty dollars. Fifty thousand dollars of this sum was paid at and about the date of the purchase, leaving twenty-six thousand five hundred and thirty dollars to be paid without interest on or before the 26th day of June next ensuing. No place of payment is named in the contract, nor in the memorandum accompanying the same when delivered in escrow to Morton E. Post & Co. Neither is it to be gathered from the language of such contract or memorandum, or the facts and circumstances of the case, as they appear to me, that it was the intention of the parties to make Cheyenne the legal place of payment. I conclude, therefore, that the money was payable to the defendants generally, unless the location of the property which it was the duty of the defendants to deliver to the plaintiff simultaneously with such payment be held to have made the place of payment at the site thereof. The additional sum, being the amount of the running expenses of the property pending the negotiations and making of the final payment, will be referred to further on, but for the present I will observe

that it was doubtless the intention of the parties that it should be payable at the same time and place as the final payment on the property.

It may be admitted, as contended for by counsel for defendants in error, that upon the making of the contract, and payment of the fifty thousand dollars thereon, the title in the property passed to the plaintiff in error, yet it is evident that neither the possession nor the right of possession of the property passed to it at that time.

The case of *Marsh et al. v. McPherson*, 105 U. S., 709, cited by counsel for the plaintiff, arose out of the sale of a large number of combined reapers and mowing and self-raking machines, then in the hands of local agents of the vendors at various points in Nebraska and Kansas. The contract or bill of sale acknowledged payment in full for said machines, and contained words of present grant, delivery, and warranty. In the opinion the court say: "The contract undoubtedly had the effect to pass the title to the machines from Marsh & Marsh to McPherson, and the right of possession; but whether the purchaser obtained actual possession could not be conclusively inferred from the contract merely."

There are many cases like *Leonard v. Davis*, 1 Black, 476, cited by counsel for defendants in error, where it was held that where certain saw logs were sold while floating in the water and only in the constructive possession of the owner, a symbolic delivery was sufficient to pass the title.

The case of *Boynton v. Veazie*, 24 Me., 286, which was also a saw log case, is an authority to the same effect. I quote from the syllabus: "The law relating to the delivery of personal property does not require parties to a sale to perform acts extremely inconvenient, if not impossible; but it accommodates itself to their business and to the nature of the property." See also, *Chaplin v. Rogers*, 1 East, 192.

In the case at bar, the property was in the actual posses-

sion of the vendors.    Through their foreman and hired
men, they were in its actual possession as much as though
it had been locked in their stables ; and while it is true
that it was not contemplated by the parties to the sale
that the cattle would be rounded up on the 26th day of
June and tolled off head by head to the plaintiff, it was
contemplated that the foreman of the defendants, the local
commander of the forces through which the dominion of
the defendants over the property was exerted and recog-
nized, would be withdrawn, and the authority and propri-
etorship of the plaintiff recognized and acknowledged.
That was the kind of delivery convenient and proper, in
view of the business of the parties, and the nature of the
property, and so the law "accommodates itself" thereto.
That was the kind of delivery of the property which it
was the duty of the defendants to make to the plaintiff on
the 26th day of June, or on such day previous thereto as
the plaintiff may have designated for closing up the trans-
action, and to give them reasonable notice thereof, and to
be present by its officer or agent ready and willing to per-
form its part of the contract.    The place of delivery was,
in the nature of things, at the ranch on Chadron creek,
the temporary residence of the foreman and men in charge
of the property, and *prima facie* the place where the prop-
erty was.

This, then, being the place of delivery, and the 26th day
of June the day of payment, it must have been within the
contemplation of the parties when making the contract
that they would both be present there, on that day; the
one to receive the money and deliver the dominion of the
property, the other to make payment, and, in the language
of the witness, "take over the property." I am strength-
ened in this belief by the consideration of the circumstance
that it was, as already stated, provided in the contract that
in addition to the payment of twenty-six thousand five
hundred and thirty dollars, to be paid on or before the

26th day of June, 1884, there was also to be paid a sum of money equal to all the running expenses of the herd of neat cattle and property in said contract described and conveyed, paid, laid out, or incurred by the defendants from the 26th day of December, 1883, up to and including the day of such payment. It appears from the bill of exceptions that the claim presented under this head by defendants, at the bank at Cheyenne, on the 26th day of June, amounted to the respectable sum of three thousand three hundred seventeen dollars and ninety-nine cents, reduced by credits to three thousand two hundred fourteen dollars and sixty-four cents. When it is borne in mind that the plaintiff was necessarily represented in these transactions throughout by an agent, a person acting in a fiduciary capacity, it must be apparent that it was contemplated, or should have been, that this account would undergo some examination, scrutiny, and verification before it would be paid. Such verification, if properly and intelligently made, would require some time, and certainly the place to make it was at the ranch where the expenditures were made, the scene of the transactions out of which they grew. The company had a right to expect that the defendants would meet its agent at the ranch and there exhibit the bill of items of the running expenses of the herd, so as to enable him to discharge his duty to them by examining and verifying the same, so that the just amount of such running expenses might be paid according to the terms of the contract and within the time therein limited.

But it is contended that the money, both for the final payment on the price of the property, and the amount of the running expenses, must have been paid, or tendered, at Cheyenne, within the time limited, in order to put the defendants in default for failing to deliver the property, and thus give the plaintiff the right of rescission. This proposition would probably be unanswerable were it true that within the language of the contract, and under all the facts

and circumstances of the transaction, the money was legally payable at Cheyenne; but, as before stated, I have reached the conclusion that it was either payable at the ranch, or generally, to the defendants.    Upon the first of these propositions we are reminded by counsel for defendants, in one or both of the briefs, that Frewen, the agent of plaintiff, when upon the stand as a witness on his cross examination, admitted that when he went to the ranch in June, expecting to "take over the property," he took no money with him.   This is true, and had the defendants been present, ready to deliver the property upon the payment of the money, and had objected to receiving the plaintiff's check on the ground that it was not a legal tender, this would have put the plaintiff in default.   But while plaintiff would have been legally in default, by reason of its agent not having carried that large amount of gold or legal tender notes to the ranch, yet in a business view it did quite the proper thing, to leave the money in bank, prepared to draw against it, and until objected to as not a legal tender, a check drawn against funds actually in bank would answer every legal purpose.

This was a legal action, and, of course, the questions involved must be decided on legal principles; but it was one of that class of actions which under the former nomenclature were called actions of assumpsit, an action which was not inaptly styled the equitable action of the common law. When a close or doubtful question is involved in a case of this character, it often occurs that the conduct of the parties in reference to the subject-matter, as tending to exhibit good faith and fair dealing, or the contrary, may be considered.   This, I think, is especially the case in an action for the rescission of a contract.

In the case at bar, the plaintiff, a corporation, through some officer or agent not disclosed by the record, purchased from the defendants cattle and ranch property at the price, as hereinbefore stated, of seventy-six thousand five

hundred and thirty dollars, paying down in cash fifty thousand dollars, within a fraction of two-thirds of the entire price, and, not to mention other peculiarities of the transaction, agreeing to leave the entire property in the hands of defendants, at plaintiff's expense, for the period of nearly three months. Somewhat less than a month before the expiration of this time, the plaintiff sent its agent to this country for the purpose of paying the defendants the amount due them on this transaction and relieving them of the possession and further care of the property.

Arriving in New York in the early part of June, he wrote to the defendants, whom he knew then to be in the city of Chicago, advising them of the time of his probable arrival at that city, and expressing a desire to meet them at one of the hotels there in regard to this contract. Arriving at Chicago about the time designated, he had an interview with Mr. Price, one of the defendants. This interview seems not to have been a very satisfactory one to either side, on account of the engagements of Mr. Price, the indisposition of Mr. Jenks, and the haste of plaintiff's agent to get on to the scene of operations at Cheyenne and Chadron Creek. My only purpose in alluding to it is, to note that defendants then had ample notice that plaintiff had its agent in this country for the purpose of meeting its engagements with them.

Frewen, the plaintiff's agent, then proceeded west, and arriving at Council Bluffs, he wrote the defendants the following letter:

"COUNCIL BLUFFS, Monday, 6-6, 1884.

"MY DEAR SIR—You will, of course, do what you think best, but I would propose that you should at once send to Cheyenne a short statement showing what moneys have been paid out by you since the 1st of January, 1884, also show what moneys you have received on the herd and what still is owing you, and at the same time you must authorize some person to act for you, unless you or one of your part-

Dakota Stock Co. v. Price.

ners come out.   If this can't be done, and done very quickly, you can't blame me if things don't go as you wish. You will also send instructions to your foreman to turn over everything to me on his receiving a telegram on or about the 26th.   If you don't approve of this you can meet me at Cheyenne after I return from the ranch, I paying you the remainder sum for herd, leaving the matter of stores and wages to be dealt with on my return to Cheyenne, on or about 1st of July.   Of course, in this case, I should take over ranch when payment is made, about 26th inst.   I think it was a great pity you failed to meet me on Saturday through your yachting engagement.

"Yours

"RICHARD FREWEN.

I shall start up north about Friday."

Mr. Frewen having arrived at Cheyenne, on the 10th day of June sent by telegraph to the defendants the following dispatch:

"Dated CHEYENNE, WYO., 10.          June 10, 1884.

"To F. PRICE, UNION LEAGUE CLUB—I start north Friday.   Will pay at once remaining money, $26,530, settling for wages and store after my return from ranch, you handing over the bill of sale deposited with Post, and wiring man in charge at ranch to turn over to me.   Reply.

"FREWEN."

To which he received the following reply:

"Dated CHICAGO, 11                          6-11, 1884.

"To R. FREWELL, CHEYENNE—Impossible to make delivery or settlement now.   Will be in Cheyenne, prepared, June 26th.                          PRICE."

The same day of the receipt of the above, Frewen wrote to the defendants the following letter, which seems to be without date:

"DAKOTA STOCK AND GRAZING COMPANY, LIMITED,
CHEYENNE, WYOMING TERRITORY.

RICHARD FREWEN, MANAGER.

"*Messrs. Price & Jenks, Chicago, Ill.*:

"DEAR SIRS—Your telegram received to-day.   I shall be prepared to take over your property in Nebraska, at your ranch, on the 26th inst. and following day.

"Yours faithfully,

"RICHARD FREWEN."

Before leaving Cheyenne for the ranch on Chadron creek, plaintiff's agent left sufficient money in the bank at the former place to pay all the demands of defendants, with a power of attorney and instructions to the cashier of the bank, as attorney of the plaintiff, to pay to the defendants the amount of the last payment on the property upon their assurance that the property would be delivered on the day named in the contract.   He then, as we have seen, proceeded to the ranch, for the purpose of "taking over" the property on or before the 26th day of June.   I lay considerable stress upon the consideration that both sums of money were payable, and hence the delivery of the property demandable, "on or before" the 26th day of June.   But under the strict terms of the contract a legal tender of the $26,530 would have been unavailing unless the amount of the expense of the herd had also been tendered.   This account, as we have seen, had then not been rendered; and its amount and the items composing it were quite unknown to plaintiff or its agent.

While there are some expressions in one or more of the above communications of Mr. Frewen which I do not fully understand, I think his course, as a whole, in respect to this matter, as shown by the bill of exceptions, is characterized by evidence of good faith and fair dealing, as well towards defendants as toward his principal, the plaintiff, and while I impute no bad faith to the defendants, yet

when we consider the peculiar situation of the property, and circumstances of the case, and the magnitude of the interest involved, it must be apparent that they were not anxious to see the transaction fairly and squarely closed up. Again, as we have seen, under the strictest construction of the contract the plaintiff had the right to pay the two sums of money therein specified on any day before the 26th day of June, as well as on that day, and would thereby not only become entitled to the possession of the property, but also to stop the running of the expense account. Therefore when the defendants telegraphed the agent of the plaintiff, on the 11th day of June, that it was impossible to make delivery or settlement then, they repudiated the contract, and this, taken in connection with their failure to deliver the property, and their positive order to their foreman not to deliver it without an order, which they never gave, I think, gave the plaintiff the right to rescind the contract.

The judgment of the district court is therefore reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.